**FILED**

**U.S. Bankruptcy Appellate Panel
of the Tenth Circuit**

**August 19, 2016**

**Blaine F. Bates
Clerk**

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

_____

IN RE STEPHEN C. THOMPSON,                    BAP No. WO-15-027

Debtor.

_____

JAMES HATFIELD, individually and as           Bankr. No. 14-12865
the surviving spouse of Wanda Hatfield,           Adv. No. 14-01081
deceased,                                                       Chapter  7

Plaintiff - Appellant,

v.                                                                      OPINION

STEPHEN C. THOMPSON,

Defendant - Appellee.

_____

Appeal from the United States Bankruptcy Court
for the District of Oklahoma Western

_____

Submitted on the briefs:[*]

Kris Ted Ledford, of Ledford Law Firm, Owasso, Oklahoma, for Appellant.

Timothy Deal Kline, of Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Appellee.

---

[*]After examining the briefs and appellate record, the Court has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  See Fed. R. Bankr. P. 8012.  The case is therefore submitted without oral argument.

_____

Before **ROMERO**, **JACOBVITZ**, and **MOSIER**, Bankruptcy Judges.

_____

**JACOBVITZ**, Bankruptcy Judge.

_____

James Hatfield appeals the bankruptcy court's summary judgment in favor of

Stephen Thompson (the "Debtor") on Hatfield's nondischargeability complaint under 11

U.S.C. § 523(a)(2)(A).[1]  Hatfield asks us to reverse because the bankruptcy court erred in

holding that (1) the underlying debt is not a debt for money, property, services, or an

extension of credit "obtained by" the alleged actual fraud; and (2) that the debt cannot be

excepted from the discharge because there is no valid fraud claim against the Debtor

under applicable Oklahoma law. As we have determined that the bankruptcy court erred

on both of these issues, we REVERSE and REMAND.

## I.    FACTUAL BACKGROUND.

Thompson owned four limited liability companies through which he leased and

operated four nursing homes in Oklahoma.[2]  The nursing home at the center of the instant

_____

[1] All future references to "Code," "Section," and "§" are to the Bankruptcy Code,
Title 11 of the United States Code, unless otherwise indicated. All future references to
"Bankruptcy Rule" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy
Procedure, unless otherwise indicated.

[2] Complaint at 2, *in* Appellant's App. at 9; Answer at 2, *in* Appellant's App. at 19.

dispute was known as the Nursing Center (the "Nursing Center"), operated by Promise McLoud, LLC. Thompson was the sole owner of Promise McLoud, LLC.[3]

Prior to operating the Nursing Center, Thompson filled out and submitted the Nursing Center's application for a certificate of need to the Oklahoma State Department of Health (the "Department of Health").[4] Thompson represented to the Department of Health that (a) he would be actively involved in the Nursing Center's operations, including formulation of governing policies affecting the quality of care; overseeing approval and implementation of its operating budget; assisting in staffing needs; monitoring operations and budget compliance; and being physically present at the Nursing Center at least eight hours per month and once every other week;[5] and (b) Promise McLoud, LLC would purchase at least $500,000.00 in "occurrence based" liability insurance for the Nursing Center (the "Representations").[6] A representative of the Department of Health testified in a deposition that the Department of Health considered the Representations important to its analysis in approving the application. The Department of Health approved the application, and granted Promise McLoud, LLC

---

[3] Complaint at 6, *in* Appellant's App. at 13; Answer at 4, *in* Appellant's App. at 21.

[4] Order Granting Motion of Stephen Thompson for Summary Judgment and Supporting Brief at 3 (the "Order"), *in* Appellant's App. at 152. Unless otherwise stated, all subsequent facts are drawn from the Order.

[5] Dep. of Stephen Thompson at 9-16, *in* Appellant's App. at 70-71.

[6] Mot. of Def. Stephen Thompson For Summ. J. and Supp. Br. at 2 n. 1, *in* Appellant's App. at 26.

a certificate of need to operate the Nursing Center on August 27, 2008. The Nursing Center commenced operations on October 1, 2008.

"Many, if not most, of Thompson's Representations never came to fruition and were not intended to come to fruition."[7] After obtaining the Nursing Center's certificate of need, Thompson had no further involvement with the Nursing Center. Similarly, Thompson had no further involvement with the other three nursing homes for which he obtained certificates of need from the Department of Health based on representations substantially the same as those made to obtain the certificate of need for the Nursing Home.[8] Thompson collected a total of $6,000.00—$1,500.00 per nursing home facility—each month from the operations of the nursing homes.[9] However, he did not personally oversee the operations of any of the four nursing homes.[10] Thompson employed Janet Swisher, an experienced Oklahoma licensed nursing home administrator and long-time registered nurse, to oversee the operations. Thompson did not interview anyone for the position of overseeing his four nursing homes, including the Nursing Center, but instead relied on his brother's suggestion of whom to hire.[11] Thompson's brother also hired Ms. Swisher to oversee four additional nursing home centers he

---

[7] Order at 3, *in* Appellant's App. at 152.

[8] Dep. of Stephen Thompson at 21-26, *in* Appellant's App. at 73-74.

[9] Dep. of Stephen Thompson at 19-33, *in* Appellant's App. at 72-76.

[10] Dep. of Stephen Thompson at 17-33, *in* Appellant's App. at 72-76.

[11] Dep. of Stephen Thompson at 23, *in* Appellant's App. at 73.

4

owned.[12]  Thompson did not attempt to ensure that Ms. Swisher was competent and capable of overseeing all eight nursing home centers.[13]  Thompson admitted that he switched the Nursing Center's liability insurance coverage from an "occurrence based" policy to a cheaper "claims-made based" policy.[14]  Additionally, Hatfield alleged that Thompson drained Promise McLoud, LLC's bank accounts of assets and diverted those funds to other businesses owned by Thompson or Thompson's brother.[15]

Soon after the Nursing Center began operations, Wanda Hatfield ("Mrs. Hatfield"), Hatfield's wife, became a resident at the Nursing Center.  Hatfield relied upon the fact that the Nursing Center was a state licensed facility in choosing the Nursing Center for Mrs. Hatfield's placement.  Mrs. Hatfield died at the Nursing Center in September 2009.[16]  Hatfield alleged that Mrs. Hatfield's death resulted from significant and painful injuries she suffered at the Nursing Center as a result of substandard care.[17]

---

[12] Dep. of Janet Swisher at 9, *in* Appellant's App. at 102.

[13] Dep. of Stephen Thompson at 42-44, *in* Appellant's App. at 98.

[14] Aff. of Stephen Thompson at 2-3, *in* Appellant's App. at 38-39. Thompson alleged that the "claims-made based" policy required claims be asserted timely, that no timely claim was asserted, but that if a timely claim had been asserted, the coverage under the "claims-made based" policy would have been as effective as coverage under an "occurrence- based" liability policy.

[15] Response at 8, *in* Appellant's App. at 54.

[16] Summary Judgment Motion at 3, *in* Appellant's App. at 27.

[17] Complaint at 4-5, *in* Appellant's App. at 11-12.

5

Hatfield filed a state court action against Promise McLoud, LLC and Thompson based on the alleged substandard care provided to Mrs. Hatfield, seeking both actual and punitive damages (the "State Court Action").[18]  Thompson filed a Chapter 7 bankruptcy case the morning of the trial in the State Court Action, staying the State Court Action as against him.  Promise McLoud, LLC failed to appear at trial.[19]  The state court entered a default judgment against Promise McLoud, LLC and allowed Hatfield to present evidence concerning damages.[20]  The state court then awarded $750,000 in actual damages and $250,000 in punitive damages against Promise McLoud, LLC (the "Judgment").[21]

Hatfield subsequently filed an adversary proceeding against Thompson in the bankruptcy case.[22]  Hatfield alleged Thompson was personally liable for the Judgment under a corporate veil piercing theory and that Thompson's alleged personal liability was nondischargeable pursuant to § 523(a)(2).[23]  Hatfield based his veil piercing theory on

---

[18] *Id*.

[19] Complaint at 5, *in* Appellant's App. at 12.  Prior to the trial, counsel for Promise McLoud, LLC filed a Notice of No Contest and advised the state court that she was withdrawing as counsel.

[20] *Id*.

[21] *Id*. at 5-6, *in* Appellant's App. at 12-13.

[22] Complaint *in* Appellant's App. at 8.

[23] Complaint at 6-8, *in* Appellant's App. at 13-15. Hatfield did not specify under which specific subsection of § 523(a)(2) – (A) or (B) – he was bringing his complaint, and therefore the bankruptcy court analyzed both in its decision. It appears clear from the record that Hatfield intended to only assert a cause of action pursuant to § 523(a)(2)(A),

Oklahoma state law allowing a plaintiff to pierce the corporate veil "under the legal doctrine of fraud."[24] Thompson filed his *Motion of Defendant Stephen Thompson for Summary Judgment and Supporting Brief* (the "Summary Judgment Motion")[25] alleging that there were no genuine issues as to any material facts with respect to his § 523(a)(2) claims and that he was entitled to judgment as a matter of law. Hatfield filed his *Plaintiff's Response to Defendant's Motion for Summary Judgment* (the "Response")[26] asserting that there were genuine issues of material fact and that the claims for piercing the corporate veil and holding the Judgment nondischargeable pursuant to § 523(a)(2)(A) should proceed to trial.

After considering the Summary Judgment Motion, Response, and part of the *Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and Supporting Brief* (the "Reply"),[27] the bankruptcy court entered its *Order Granting Motion of Stephen Thompson for Summary Judgment and Supporting Brief* (the "Order"). In the Order, the bankruptcy court granted summary judgment in favor of Thompson and

---

and not (B). In any regard, Hatfield has not appealed the bankruptcy court's grant of summary judgment as to § 523(a)(2)(B).

[24] Complaint at 6, *in* Appellant's App. at 13.

[25] Summary Judgment Motion *in* Appellant's App. at 25.

[26] Response *in* Appellant's App. at 45.

[27] Reply *in* Appellant's App. at 140. The bankruptcy court stated that it only considered the first five pages of the Reply because "[t]he Reply does not comply with Local Rule 7056-1.D as it exceeds five pages and leave of Court was not obtained to file an oversize reply brief." Order at 2 n. 1, *in* Appellant's App. at 151.

held: (1) the debt at issue was not "the type of debt that can be excepted from discharge under Section 523(a)(2)(A);" and (2) Thompson could not satisfy the elements for fraud under Oklahoma state law.[28] Hatfield assigns error to these two holdings.

## II.    STANDARD OF REVIEW.

We review an order granting summary judgment *de novo*, applying "the same legal standard as was used by the bankruptcy court to determine whether either party is entitled to judgment as a matter of law."[29] Summary Judgment is appropriate if all of the pleadings, depositions, and discovery responses, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.[30] A "defendant moving for summary judgment need not negate the [ ] claim, but need only point out to the [ ] court that there is an absence of evidence to support the nonmoving party's case."[31] "Reasonable inferences that may be made from the proffered [facts] should be drawn in favor of the non-moving

---

[28] Order at 9, *in* Appellant's App. at 158.

[29] *LTF Real Estate Co. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014) *aff'd*, 619 F. App'x 779 (10th Cir. 2015) (quoting *Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 180 (10th Cir. BAP 2012), *aff'd*, 749 F.3d 895 (10th Cir. 2014)).

[30] *Bank of Cushing v. Vaughn (In re Vaughn)*, No. WO-04-039, 2006 WL 751388, at *2, 342 B.R. 385, (10th Cir. BAP Mar. 22, 2006) (citing Fed. R. Civ. P. 56(c)).

[31] *In re Stat-Tech Inter. Corp.*, 47 F.3d 1054, 1058 (10th Cir. 1995) (quoting *Universal Money Ctrs., Inc. v. AT&T Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal citations omitted)).

party . . . ."[32]  "Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial 'as to dispositive matters for which it carries the burden of proof'" or, assuming there are no issues as to dispositive facts, that the moving party is not entitled to judgment as a matter of law.[33] "[I]f two reasonable factfinders could reach different conclusions . . . from the undisputed facts, summary judgment is not warranted."[34]

## III.    APPELLATE JURISDICTION.

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[35] The appealed orders together dispose of all of the claims in the adversary proceeding, thus they are final orders for purposes of appeal.[36] Hatfield timely filed a notice of appeal from the Order. None of

---

[32] *Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 715 (Bankr. N.D. Okla. 2007).

[33] *Vaughn*, 2006 WL 751388, at \*2 (quoting *Applied Genetics Int'l. Inv. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)).

[34] *Hentges*, 373 B.R. at 715 (citing *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1382 (10th Cir. 1980)).

[35] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002; 10th Cir. BAP L.R. 8001-3.

[36] *Long v. St. Paul Fire and Marine Ins. Co.*, 589 F.3d 1075, 1078 n. 2 (10th Cir. 2009) ("[O]nce the district court enters a final order, its earlier interlocutory orders merge into the final judgment and are reviewable on appeal."); *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 785 (10th Cir. BAP 1997) (bankruptcy court's summary judgment order on nondischargeability claim under fraud exception, combined with judgment for debtor from trial of claims seeking denial of discharge, disposed of entire complaint, and orders thus were final and appealable).

the parties elected to have this appeal heard by the United States District Court for the Western District of Oklahoma.  The parties have therefore consented to appellate review by this Court.

## IV.    DISCUSSION.

The issues presented in this appeal relate to whether Thompson is entitled to summary judgment on Hatfield's claim that his debt is excepted from discharge under § 523(a)(2)(A)'s actual fraud exception to discharge.  Hatfield asserts that the bankruptcy court erred by (1) not distinguishing that, while Hatfield's claim against Promise McLoud, LLC was based on negligence, his claim against Thompson was a fraud-based corporate veil piercing claim under Oklahoma law; and (2) by not properly applying the actual fraud exception to discharge under § 523(a)(2)(A).  We will address both issues.

A.    *A debt proven under state law on grounds other than fraud can be excepted from discharge under the actual fraud provision of § 523(a)(2)(A).*

Subject to an exception not applicable here, the actual fraud exception to discharge under § 523(a)(2)(A) excepts from discharge (a) any debt; (b) for money, property, services, or other credit; (c) to the extent obtained by actual fraud.[37]  Dischargeability actions require a two-part analysis: first, the bankruptcy court must determine the validity of the debt under applicable law (the claim on the debt);[38] and second, the bankruptcy

---

[37] *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016) (holding that actual fraud is a separate ground under § 523(a)(2)(A) for excepting a debt from discharge).  The Supreme Court decided *Husky* after the bankruptcy court issued the Order at issue in this appeal.  We rely heavily on *Husky* in deciding to reverse.

[38] Although the validity of the debt typically is governed by state law, there are circumstances where it may be governed by federal law, and even the Code itself.  For

10

court must determine the dischargeability of that debt under § 523 (the dischargeability claim).[39]

The dischargeability analysis begins with a determination of whether there is a valid debt. "Debt" is defined in the Code as "liability on a claim,"[40] and "claim" is defined in turn as a "right to payment."[41] For purposes of § 523(a)(2)(A), "debt" means liability on "an enforceable obligation."[42] Whether a debt exists is determined by looking to applicable law, frequently state law. Section 523(a)(2)(A)'s use of the term "*any* debt"

---

example, the debt may be established under bankruptcy law where a money judgment was entered against an individual in a fraudulent transfer adversary proceeding under § 548 in a prior bankruptcy case of a different debtor, and that individual later files his or her own bankruptcy case to discharge that debt. *Diamond v. Vickery* (*In re Vickery*), 488 B.R. 680, 684 (10th Cir. BAP 2013).

[39] *Resolution Tr. Corp. v. McKendry* (*In re McKendryI*, 40 F.3d 331, 336 (10th Cir. 1994) ("In bankruptcy court there are two separate and distinct causes of action: 'One cause of action is on the debt and the other cause of action is on the dischargeability of that debt, a cause of action that arises solely by virtue of the Bankruptcy Code and its discharge provisions.'" (quoting *In re Moran*, 152 B.R. 493, 495 (Bankr. S.D. Ohio 1993) (internal citations omitted)). *Cf Brown v. Felsen*, 442 U.S. 127, 138 (1979) (holding that a non-fraud based state court judgment does not preclude the bankruptcy court from determining dischargeability if the "true nature of the debt" sounds in fraud). We use "claim" as synonymous with "cause of action" for purposes of applying § 523(a)(2)(A), consistent with the synonymous nature of those terms under the doctrines of res judicata and claim preclusion." *Compare* Restatement (First) of Judgments § 62 (Am. Law Inst. 1942) (using the term "cause of action") *with* Restatement (Second) of Judgments § 25 (Am. Law Inst. 1982) (using the term "claim").

[40] 11 U.S.C. § 101(12).

[41] 11 U.S.C. § 101(5)(A).

[42] *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (quoting *Pa. Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990) (reaching this conclusion after examining the definition of "debt" under §§ 101(5)(A) and 101(12)).

(emphasis added) indicates that "debt" as used in § 523(a)(2)(A) is not restricted to a debt established under any particular theory of recovery. To establish the validity of the debt under § 523(a)(2)(A), the claimant must establish that the debtor is liable on an enforceable obligation under applicable law, nothing more nor less.

The bankruptcy court held that Hatfield's claim to establish the validity of the debt must satisfy the elements of an Oklahoma state law fraud claim. The Code, however, does not require that to except debt arising under state law from discharge under § 523(a)(2)(A) the claimant necessarily must prove fraud under state law.[43] Claims established under state law on grounds other than fraud are not automatically precluded from qualifying for the exception to discharge under § 523(a)(2)(A).[44]

In reaching its holding, the bankruptcy court relied on a confusing statement of law in *In re Lang*, 293 B.R. 501, 513 (10th Cir. BAP 2003). In *Lang*, relying on *Grogan v. Garner*,[45] the Bankruptcy Appellate Panel for the Tenth Circuit held that "[t]he state

---

[43] *Cf. Brown v. Felsen*, 442 U.S. 127 (holding that a creditor is not barred by res judicata [claim preclusion] from establishing nondischargeability of a debt liquidated under a state court judgment that did not contain a finding of fraud.); *McKendry*, 40 F.3d at 333 (identifying the underlying debt merely as a "deficiency judgment" without referring to fraud).

[44] *See e.g.*, *Tummel & Carroll v. Quinlivan* (*In re Quinlivan*), 434 F.3d 314, 319 (5th Cir. 2005) (holding that a debt established under a state law breach of contract theory of recovery could be excepted from discharge under § 523(a)(2)(A)); *Kaleta v. Sokolow*, 183 B.R. 639, 642 (M.D. Ala. 1995) (holding that the creditor's claim established under a state law breach of contract theory of recovery could be excepted under § 523(a)(2)(A) where the creditor would be time barred from liquidating its claim under a fraud but not a breach of contract theory of recovery).

[45] 498 U.S. 279 (1991).

12

law of fraud controls with respect to whether fraud has occurred, while bankruptcy law controls with respect to the determination of nondischargeability."[46]  However, in *Grogan*, the Supreme Court of the United States did not state that only a debt sounding fraud under state law can potentially be excepted from the discharge under § 523(a)(2)(A).  In *Grogan*, the Supreme Court held in the context of a debt arising under state law that "[t]he validity of a creditor's claim is determined by rules of state law.  Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code."[47]  In *Lang*, the creditor's claim under state law was based on false representations.  Put in that context, the statement in *Lang* that "the state law of fraud controls with respect to whether fraud has occurred"[48] is accurate.[49]  *Lang* does not stand for the broader proposition that that only debts established under state law fraud theories of recovery may be excepted from discharge under § 523(a)(2).[50]  To the extent the bankruptcy court may have interpreted *Lang* to

---

[46] *Lang*, 293 B.R. at 513 (citing *Grogan v. Garner*, 498 U.S. 279, 283-84, (1991)).

[47] *Grogan v. Garner*, 498 U.S. 279, 283-84, (1991) (internal citations omitted) (citing *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946) and *Brown v. Felsen*, 442 U.S. 127, 129-30, 136 (1979)).

[48] *Lang*, 293 B.R. at 513.

[49] *Id.*

[50] In *Vickery*, the debtor was an owner of a business that had previously filed a Chapter 11 bankruptcy petition.  The trustee in the previous case obtained a $3.6 million joint liability judgment against the business, the debtor, and others.  In the debtor's bankruptcy case, the trustee sought to have that debt excepted from discharge on the basis of actual fraud under § 523(a)(2)(A).  Footnote 63 in *Vickery* directs the bankruptcy court as follows: "Upon remand to the bankruptcy court, we note also that we have previously

lend itself to such a broad proposition, such interpretation clearly conflicts with binding

Supreme Court precedent[51] and we decline to give *Lang* any such broad interpretation.

Hatfield alleged Thompson was liable for the debts owed to him by of Promise

McLoud, LLC under a veil piercing theory.[52]  Hatfield's state law claim to pierce the

corporate veil of Promise McLoud, LLC, however, was not raised in Thompson's

Summary Judgment Motion and, accordingly, the bankruptcy court did not address it.[53]

Ultimately, the bankruptcy court's application of the legal standard to determine whether

there existed a debt under state law of the type that potentially could be excepted from the

discharge under § 523(a)(2)(A) was in error.  The state law elements of fraud need not

necessarily be met to establish that a debt arising under state law is nondischargeable

under § 523(a)(2)(A).

B.    *There are facts in genuine dispute that preclude summary judgment in
      favor of Thompson on Hatfield's § 523(a)(2)(A) claim.*

---

stated that the 'state law of fraud controls with respect to whether fraud has occurred,
while bankruptcy law controls with respect to the determination of nondischargeability.'"
(quoting *Lang*, 293 B.R. at 513).  Because the only issue on appeal in *Vickery* was the
dischargeability of the debt, not the validity or amount of the debt, this statement is dicta.

[51] *Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016); *Grogan*, 498 U.S.
at 283-84.

[52] Complaint at 8, *in* Appellant's App. at 15.

[53] Order at 6, *in* Appellant's App. at 155 ("Hatfield argues that the wrongful death
judgment against Promise McLoud can be imposed on Thompson based on a the theory
of piercing the corporate veil. . . . The Court does not address such argument as the
[Summary Judgment] Motion seemingly assumes that the debt is a debt of Thompson.").
    w

Once the creditor has established the claim on the debt under applicable law, the court must determine whether the debt is dischargeable. To establish that a debt is excepted from discharge under § 523(a)(2)(A) based on actual fraud, the creditor must show: (a) the debtor committed actual fraud; (b) the debtor obtained money, property, services, or credit by the actual fraud; and (c) the debt arises from the actual fraud. We will discuss each of these elements in turn. But before doing so, will address some of the things these elements do not require.

In determining the nondischargeability of the debt under § 523(a)(2)(A) based on actual fraud, there is no requirement that a creditor rely on the actual fraud or part with assets or receive credit at the inception of, or concurrently with, the actual fraud.[54] Nor is there a requirement that the debtor's actual fraud induced the creditor to part with property or extend credit.[55]

*The First Element – Actual Fraud*

The first element of a nondischargeability claim under § 523(a)(2)(A) predicated on actual fraud is to show "actual fraud." Showing "actual fraud" has two parts: "actual"

---

[54] *Husky*, 136 S.Ct. at 1587, 1591.

[55] *Id*. at 1587 ("[in fraudulent conveyance cases], the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance.").

and "fraud."[56] For fraud to be "actual" fraud there must be wrongful intent.[57]

Constructive or implied fraud is not actual fraud.[58]

"Fraud," as used in § 523(a)(2)(A), connotes deception or trickery.[59] In *Husky*, the Supreme Court specifically decided not to adopt a definition of the "fraud" component of "actual fraud" for all times and all circumstances but did give some guidance.[60] Actual fraud does not require that the debtor make any misrepresentations.[61] Further, the debtor must have taken some action in furtherance of the debtor's wrongful intent. In *Husky*, the Supreme Court held that the debtor, by causing a corporation he controlled to transfer assets to other entities he controlled for the purpose of impeding collection of a judgment against the transferor corporation, committed actual fraud.[62] In *Vickery*, this Court held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of

---

[56] *Id*. at 1586.

[57] *Id*. (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878)); *see also In re Vickery*, 488 B.R. at 690 (defining "actual" fraud as "involving fraudulent intent.").

[58] *Id*. at 1586.

[59] *Id*.

[60] *Husky*, 136 S.Ct. at 1586.

[61] *Id*. at 1587.

[62] *See Id*. at 1585-86.

16

property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code."[63]

In support of his fraud claim, Hatfield alleges the following:

(a)     Hatfield owned and controlled Promise McLoud, LLC, which in turn owned the Nursing Home;

(b)     To obtain a certificate of need to operate the Nursing Home, Thompson made representations to the Department of Health (i) that he would be actively involved in the Nursing Center's operations, including formulation of governing policies affecting the quality of care; overseeing approval and implementation of its operating budget; assisting in staffing needs; monitoring operations and budget compliance; and being physically present at the Nursing Center at least eight hours per month and once every other week; and (ii) that Promise McLoud, LLC would purchase at least $500,000.00 in "occurrence based" liability insurance for the Nursing Center;

(c)     The Department of Health relied on those representations in issuing a certificate enabling the Nursing Home to operate;

(d)     Thompson did not do, and never intended to do, any of these things he represented to the Department of Health that he would do in order to obtain issuance of the certificate of need;

---

[63] *Vickery,* 488 B.R. at 690 (quoting *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (6th Cir. BAP 2001)).

(e)     Thompson collected monthly payments from the operations of the Nursing Center and the other three nursing homes;

(f)     Thompson drained Promise McLoud, LLC's bank accounts of assets and diverted those funds to other businesses Thompson or his brother owned;

(g)     Thompson acted throughout with fraudulent intent;

(h)     Mrs. Hatfield would not have died had Thompson acted in accordance with his representations to the Department of Health and not drained the bank accounts; and

(i)  Mrs. Hatfield's death was a foreseeable consequence of Thompson's conduct.

If proven, such facts together with other relevant facts and circumstances could establish the requisite wrongful intent and conduct sufficiently imbued by deception or trickery to deprive or cheat another of property or a legal right that would allow Hatfield to succeed on his § 523(a)(2)(A) claim.  Hatfield thus pleads a set of facts, that if proven, could establish actual fraud under § 523(a)(2)(A).[64]  In connection with the Summary Judgment Motion, not all of these allegations have been established as facts.[65]  As there are remaining genuine issues of material fact with respect to the first element—actual fraud—summary judgment is not appropriate.

*The Second Element – Obtaining Money,*
*Property, Services, or Credit by Actual Fraud*

---

[64]  We need not decide what portion of this conduct would be sufficient to establish actual fraud.

[65] Order at 3-5, *in* Appellant's App. at 152-54. Unless otherwise stated, all subsequent facts are drawn from the Order.

The second element requires that the debtor obtained "money, property, services, or . . . credit" by the actual fraud. The bankruptcy court concluded that "[b]ecause the state court judgment does not represent a debt by Thompson for anything that Thompson obtained from Hatfield, such debt does not constitute the type of debt that can be excepted from discharge under Section 523(a)(2)(A)."[66] However, there is no requirement that the debt be for something the debtor obtains from the creditor.

Section 523(a)(2)(A) provides that a debtor is not discharged "from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, *to the extent obtained by* . . . actual fraud."[67] "Obtained by" modifies "money, property, services, or an extension, renewal, or refinancing of credit" not "debt."[68] Therefore, if

---

[66] Order at 9, *in* Appellant's App. at 158.

[67] 11 U.S.C. § 523(a)(2)(A) (emphasis added).

[68] *Cohen v. de la Cruz*, 523 U.S. 213, 216 (1998). In *Husky*, the Supreme Court, addressing § 523(a)(2)(A)'s "obtained by" requirement and without citing to *Cohen*, stated:

> [T]he recipient of a [fraudulent] transfer—who, with the requisite intent, also commits fraud—can obtain assets by his or her participation in the fraud. If that recipient later files for bankruptcy, any debts traceable to the fraudulent conveyance . . . will be nondischargeble under § 523(a)(2)(A). . . . [Thus,] at least sometimes a debt 'obtained by' a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A).

*Husky*, 136 S.Ct. at 1589 (internal citations and quotation marks omitted). While these statements could be read to impliedly undermine *Cohen*'s interpretation of § 523(a)(2)(A)'s "obtained by" requirement, we are bound to apply the *Cohen* holding because it directly and explicitly addresses whether "obtained by" in § 523(a)(2) modifies "debts" or "money, property, services" etc. *See United States v. Hatch*, 722 F.3d 1193, 1204–05 (10th Cir. 2013) ("Thus, even if we assume Hatch's authorities

19

the debtor obtains money, property, services, or an extension, renewal, or refinancing of credit by false pretenses, false representations, or actual fraud, any liability of the debtor arising from[69] the false pretenses, fraud, representations, or actual fraud is excepted from the discharge.[70] Further, the nondischargeable liability under § 523(a)(2)(A) is not

---

impliedly undermine *Jones's* approach to the Thirteenth Amendment, we may not blaze a new constitutional trail simply on that basis: 'If a precedent of [the Supreme] Court has direct application in a case'—such as Jones has to this case—'yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, (1989)).

[69] The Supreme Court has characterized the required causal link between the "false pretenses, false representations, or actual fraud" and the "debt" by using the terms "arising from," "resulting from," and 'traceable to" as interchangeable in that context. *See Cohen*, 523 U.S. at 218 ("Moreover, the phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to which 'any debt' *arising from* fraud is excepted from discharge." (emphasis added)); *Field v. Mans*, 516 U.S. 59, 61, (1995) ("The Bankruptcy Code's provisions for discharge stop short of certain debts *resulting from* 'false pretenses, a false representation, or actual fraud.' (emphasis added)); *Husky*, 136 S.Ct. at 1589 ("If that recipient later files for bankruptcy, any debts '*traceable to'* the fraudulent conveyance, will be nondischargable under § 523(a)(2)(A)." (internal citations omitted)(emphasis added)). For consistency, we use only "arising from" in this Opinion to mean the same thing as "resulting from" and "traceable to." What is required to satisfy the required causal link is not at issue in this appeal. As such, we decline to address it.

[70] *Id.* at 220-21 ("When construed in the context of the statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud."). *See also Husky* 136 S. Ct. at 1589 (a debtor with the requisite intent who commits actual fraud can obtain assets by his or her participation in the fraud rendering the debt nondischargeable under § 523(a)(2)(A)); *In re Vickery*, 488 B.R. at 691 ("[T]he Trustee may prevail under § 523(a)(2)(A) if he shows that the debt [owed] is for money obtained by actual fraud"). The Tenth Circuit has not directly addressed the requirement that money, property, services, or other credit be obtained by the fraud. The Tenth Circuit's decision in *Fowler Bros. v. Young* (*In re Young*), 91 F.3d 1367, 1373

limited to compensatory damages,[71] nor does the value of the money, property, services, or credit obtained by fraud limit the amount of the nondischargeable debt.[72] There is no requirement under § 523(a)(2)(A) that the debtor obtain the debt by actual fraud or that the debt is for something the debtor obtained by actual fraud.[73]

---

(10th Cir. 1996), which addressed exceptions to discharge under § 523(a)(2)(A) based on false representations, predates *Cohen* and *Husky*.

[71] *Id*. at 222-23.

[72] *Id.* (the debtor's liability may exceed the value obtained by the debtor). In *Cohen*, the Supreme Court used the following example to illustrate § 523(a)(2)(A)'s function of allowing full recovery of all losses arising from fraud:

> [I]f . . . the fraud exception only barred discharge of the value of any money, property, etc., fraudulently obtained by the debtor, the objective of ensuring full recovery by the creditor would be ill served. Limiting the exception to the value of the money or property fraudulently obtained by the debtor could prevent even a compensatory recovery for losses occasioned by fraud. For instance, if a debtor fraudulently represents that he will use a certain grade of shingles to roof a house and is paid accordingly, the cost of repairing any resulting water damage to the house could far exceed the payment to the debtor to install the shingles. *Id*. at 222.

[73] There is a circuit split regarding whether a debtor must *personally* receive money, property, services, or other credit. *See HSSM #7 Ltd. P'ship v. Bilzerian* (*In re Bilzerian*), 100 F.3d 886, 890 (11th Cir. 1996) (discussing whether a debtor must personally receive money before the exception to discharge of § 523(a)(2)(A) can apply). The first approach requires the debtor personally receive money, property, services, or credit "through her fraud or use of false pretenses." *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 219 (4th Cir. 2007). The second approach prevents an innocent debtor from discharging liability for the fraud of his partners, regardless whether he receives a monetary benefit. *Deodati v. M.M. Winkler & Assocs.* (*In re M.M. Winkler & Assocs.*), 239 F.3d 746, 751 (5th Cir. 2001). The Ninth Circuit has adopted a third approach, holding that "the receipt of a benefit is no longer an element of fraud under § 523(a)(2)(A)." *Muegler v. Bening*, 413 F.3d 980, 984 (9th Cir. 2005). As Thompson personally received money or property from the alleged fraud, we need not decide this issue.

21

Facts in genuine dispute preclude summary judgment in favor of Thompson on the second element, that the debtor "obtained money, property, services, or . . . credit" by the alleged actual fraud. Thompson obtained $6,000.00 per month based on the operations of the Nursing Center and the three other nursing homes.[74] Thompson obtained a certificate of need for Promise McLoud, LLC, which is a property right in itself, and allowed his wholly owned limited liability company to operate a nursing home.[75] This presumably would have increased the value of his interest in Promise McLoud, LLC.

*The Third Element – The Debt Arises From the Actual Fraud*

The third element requires that the debt arise from the actual fraud.[76] The debt Thompson seeks to except from discharge is his fraud-based corporate veil piercing claim, not Promise McLoud, LLC's debt based on providing substandard care. The conduct upon which Hatfield's state law veil piercing claim is based is substantially the same conduct underlying Hatfield's claim of actual fraud under § 523(a)(2)(A). Similarly, in *Husky*, the conduct that was the basis for the state law fraudulent conveyance claim and the claim for actual fraud under § 523(a)(2)(A) was substantially

---

[74] Response at 10, *in* Appellant's App. at 56.

[75] Summary Judgment Motion at 2, *in* Appellant's App. at 26.

[76] *Cohen*, 523 U.S. at 215, 218 ("We hold that § 523(a)(2)(A) prevents the discharge of all liability arising from fraud . . . ." *Id*. at 215. "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id*. at 218.). *See also Husky*, 136 S. Ct. at 1589 ("any debts 'traceable to' the fraudulent conveyance will be nondischargable under § 523(a)(2)(A).") (internal citation omitted).

the same.[77]  Although Hatfield may not have a claim for fraud under Oklahoma law,

Hatfield alleges a fraud-based corporate veil piercing claim under Oklahoma law that

may arise from actual fraud under § 523(a)(2)(A).  Because genuine issues of material

fact remain with respect to the third element of Hatfield's claim under § 523(a)(2)(A) an

entry of summary judgment is not appropriate.

Based on the foregoing, we hold that summary judgment in favor of Thompson

under § 523(a)(2)(A) is not appropriate.  We REVERSE and REMAND for further

proceedings consistent with this opinion.

---

[77] *Husky*, 136 S. Ct. at 1585-86.