IN RE: Richard B. PEARL, Debtor

**Richard Feldman, individually and as Assignee of claims by Riverfront Diet Clinic, Inc., Plaintiff**

v.

**Rick Pearl, Defendant**

**CASE NO. 16–20305
ADV. NO. 16–2006**

United States Bankruptcy Court,
E.D. Kentucky,
Covington Division.

Signed September 29, 2017

Michael B. Baker, Covington, KY, William R. O'Bryan, Jr., Nashville, TN, for Plaintiff.

Stuart P. Brown Covington, KY for Defendant.

## MEMORANDUM OPINION

Tracey N. Wise, Bankruptcy Judge

This unfortunate dispute involves two cousins and longtime close friends who owned a business together. When their business failed, their relationship splintered among accusations of misconduct, and litigation in multiple venues ensued. Ultimately, this Court held a trial on the merits of the claims that Plaintiff asserted against Debtor/Defendant relating to funds disbursed from the business; specifically, a loan made to Plaintiff and a disparity in distributions from the business to the parties.

Debtor Richard B. Pearl filed a chapter 13 petition on March 11, 2016. He listed Plaintiff Richard Feldman and their co-owned business, Riverfront Diet Clinic, Inc. ("RDC"), as creditors. Plaintiff filed three proofs of claim in the bankruptcy case. Claim 9, filed on behalf of Plaintiff personally, asserts an unsecured debt owed for fraud totaling $50,000.00. Claim 10, filed by Plaintiff as "Assignee of Riverfront Diet Clinic, Inc., in dissolution," seeks to recover an unsecured debt owed to RDC totaling $283,821.77 for "Fraud and/or unauthorized withdrawals from RDC."[1] Claim 11, also filed on behalf of Plaintiff personally, asserts an unsecured debt totaling $188,607.25 owed for "Fraud and/or unauthorized withdrawals from RDC," *i.e.*, for about two-thirds of the debt allegedly owed to RDC. Debtor objected to all three claims.

Plaintiff filed the Complaint initiating this proceeding on July 18, 2016. He asks this Court to find that Debtor owes debts to Plaintiff and RDC that should be excepted from Debtor's discharge under § 523(a)(2), (4) and (6).[2] Debtor filed an Answer to the Complaint and asserted counterclaims, which the Court dismissed upon Plaintiff's motion. *Feldman v. Pearl (In re Pearl)*, AP Case No. 16-2006, 2017 WL 932951, 2017 Bankr. LEXIS 616 (Bankr. E.D. Ky. Mar. 8, 2017).

The parties appeared for trial on Plaintiff's claims on July 25, 2017. Plaintiff, represented by counsel, called three live witnesses: (i) himself; (ii) Debtor; and (iii) Rex Leatherwood, Esq., an attorney with business and legal ties to Plaintiff and his wholly-owned business. Without objection, Plaintiff also introduced into evidence prior testimony given by Debtor at a deposition and at his Rule 2004 examination, as well as the deposition testimony of two

1. Plaintiff introduced into evidence an assignment agreement between RDC and Plaintiff dated July 15, 2015, which states that RDC "hereby sells, transfers, and assigns to [Plaintiff], the Assignee ... any and all claims, demands, and cause or causes of action of any kind whatsoever which the undersigned corporation has or may have against Rickie Pearl, or any other business entity or individual." [ECF No. 57–22.]

2. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

witnesses residing in Tennessee beyond the Court's subpoena power: (i) Shawn Sirgo, Esq., another attorney connected to Plaintiff and his wholly-owned business, as well as to debtor, and (ii) Larrice Carter, CPA, an accountant working for Plaintiff and his wholly-owned business. Debtor, also represented by counsel, called Pamela Gross, the bookkeeper and tax preparer for Debtor and RDC. No experts testified at trial. Post-trial, each party tendered proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Early history.

Plaintiff Richard Feldman and Debtor Richard Pearl are second cousins. They grew up together and were very close as youths—Plaintiff testified that they were best friends—even seeing a Beatles concert together in happier days. Both men ultimately assumed careers in the diet clinic business, including through ownership of RDC, a Kentucky corporation operating in Covington, Kentucky. Plaintiff, a medical doctor, also has provided operating assistance to many other diet clinics in multiple states through a wholly-owned Tennessee business, Doctors' Diet, Inc. ("DDI"). He owns interests in two other clinics, but Plaintiff does not own a stake in the vast majority of the clinics to which DDI provides services.

Debtor, a Kentucky citizen, formed RDC in April 1996. Its original owners were Debtor, Plaintiff, and non-party Kevin Henderson. In the late 1990s, Plaintiff conveyed his interest in RDC to Henderson to settle a dispute, leaving Henderson and Debtor as RDC's only shareholders until February 2010. Debtor was listed as RDC's President on all of RDC's annual reports filed between 1997 and 2012. RDC has been inactive and in bad standing with the Kentucky Secretary of State since its administrative dissolution in September 2013. RDC ceased operations in the fall of 2014.

### II. After RDC experiences business troubles, Plaintiff rejoins RDC.

Beginning in late 2009 or early 2010, RDC had a dispute with a physician that hurt its financial position and jeopardized its future. The physician, who had been affiliated with RDC, took patient files to form a competing business. Debtor was suffering from serious health issues at the time and called his cousin for help because of his experience with weight loss clinics and with RDC. Plaintiff agreed to assist. In February 2010, he and others associated with DDI came to Covington to stabilize RDC's affairs, including that DDI loaned funds to RDC. Plaintiff referred to these DDI loans as "my loans" at trial.

When Plaintiff returned to assist, Henderson, Debtor and Plaintiff entered into a new ownership arrangement under which each owned one-third of RDC. Plaintiff also became RDC's Treasurer. While Debtor continued to operate RDC on a day-to-day basis, Plaintiff became intimately involved in advertising, staffing, and other RDC business matters. Plaintiff and Debtor were in frequent contact, sometimes speaking multiple times in a day, and Plaintiff obtained updates from Debtor on RDC's day-to-day financial performance on request.

Upon Plaintiff's return to RDC, Plaintiff and Debtor agreed that Debtor would receive a salary of $1,000.00 per week as RDC's principal operator. They further agreed that distributions to the two from RDC above that salary would be equal. Plaintiff posits that Debtor took a highly uneven amount of draws from RDC in violation of this agreement—which was not memorialized in a writing signed by Debt-

or, Plaintiff, Henderson, or anyone on RDC's behalf. Neither party explained Henderson's position on this distribution arrangement, or stated whether Henderson also was to receive distributions. Henderson did not participate in the trial.

Also upon Plaintiff's return, DDI began to provide goods and management services to RDC. Unlike DDI's relationships with other diet clinics, DDI and RDC did not have a written contract pursuant to which DDI would deliver its services in exchange for six percent of RDC's gross revenues. Nevertheless, Plaintiff and Debtor, who together owned two-thirds of RDC at the time, agreed that DDI would receive six percent of RDC's gross revenues as a fee for its services. RDC also would pay DDI for certain specific goods. For example, RDC bought folders from DDI containing information on the diet program, which RDC gave to customers.

About three years after Plaintiff rejoined RDC, he acquired Henderson's stock, leaving the two cousins as the sole co-owners of RDC. RDC's By-laws dated March 2013 listed Debtor as RDC's President, Debtor's wife, Elaine, as RDC's Secretary, and Plaintiff as RDC's Treasurer.[3] As of the trial, Plaintiff owned two-thirds of RDC's stock and Debtor owned the remaining third.

## III. Facts relating to Plaintiff's two claims against Debtor.

### A. Plaintiff's $50,000.00 loan.

Although Plaintiff became RDC's Treasurer in February 2010, Debtor kept control over its checkbook and he directed payments for the business. At some point between Plaintiff's return to RDC and May 11, 2010—Plaintiff did not establish the specific date at trial despite its signifi-

cance to his claim—Plaintiff orally asked Debtor to cause RDC to loan him $50,000.00. Plaintiff did not offer a business purpose for the loan, or explain why he wanted a loan from RDC, a diet clinic (not a bank) which Plaintiff testified was in financial trouble.

Debtor told Plaintiff that RDC did not have the funds to make the loan, but that Debtor would loan him the requested $50,000.00. Plaintiff accepted Debtor's offer. No written agreement exists with respect to this loan.

In the same general time frame, Debtor was in the midst of a separate dispute with Henderson (then a RDC co-shareholder) and Debtor wanted to protect his money. On April 20, 2010, Debtor and his spouse had a personal joint checking account with a balance of $82,829.04. On April 22, Debtor deposited a $50,000.00 check from RDC into the personal account, leaving RDC with about $18,000.00 in its account. Then, on April 27, Debtor sent $132,000.00 from the personal account to Nashville attorney Shawn Sirgo. Sirgo served for a time as DDI's corporate counsel, represented Plaintiff individually in certain matters, and knew Debtor due to Sirgo's involvement in RDC's rescue in February 2010. Sirgo deposited Debtor's funds into his business account, leaving a balance of $1,220.43 in Debtor's personal account.

On May 11, 2010, Sirgo received an email from Debtor authorizing the loan to Plaintiff. Sirgo then wrote a $50,000.00 check to Plaintiff from his business account on that same date, with the check's memo line stating "Loan From Rick Pearl." Sirgo understood that Debtor was making a personal loan to Plaintiff because Plaintiff "was requesting sums of money for his daughter's wedding and for other personal things." [ECF No. 70–1 at 13.]

---

**3.** Elaine was neither a RDC employee nor active in its affairs.

Nearly two years later, on May 8, 2012, through Sirgo, Debtor inquired about Plaintiff's repayment of the loan. In July 2012, Plaintiff withdrew $40,000.00 from his personal account and sent it to Debtor. DDI—Plaintiff's wholly-owned entity—also sent a $10,000.00 check to Debtor that month. Plaintiff testified that he took a $10,000.00 loan from DDI to pay Debtor back, but offered no documents proving that he and DDI treated this as a loan. Plaintiff also testified that DDI's money "is my money" because he is its sole owner. Debtor accepted these payments in full satisfaction of the loan; in other words, Plaintiff paid no interest in exchange for the use of the $50,000.00 for over two years.

## B. Disbursements from RDC.

Plaintiff also contends that Debtor surreptitiously took disproportionate draws from RDC. According to Plaintiff, he received only four distributions totaling $86,028.97 from RDC between February 17, 2010, and June 6, 2014. In contrast, Debtor either received from RDC, or had RDC send on his behalf, 24 checks totaling $369,850.74 between January 8, 2010, and June 6, 2014.[4] Plaintiff asserts that this constitutes embezzlement from RDC.

For support, Plaintiff introduced deposition testimony from Larrice Carter, CPA. Carter, a former revenue agent for the Internal Revenue Service, began working as an accountant for Plaintiff and DDI in 2012. Plaintiff asked Carter to examine RDC's books in or around the end of 2014

or beginning of 2015. Carter obtained RDC's financial and payroll records from or with the help of RDC's bookkeeper and tax preparer, Pamela Gross. Initially, Plaintiff asked Carter to investigate the amounts paid to Gross. Reviewing the records, however, Carter concluded that, even setting aside Debtor's $1,000.00 weekly salary, the amounts paid to Debtor were substantially greater than the amounts paid to Plaintiff. Plaintiff introduced into evidence a summary that Carter compiled comparing RDC distributions to Plaintiff and Debtor, along with back-up documentation. [ECF Nos. 57–23 through 26.][5]

According to Carter's summary, between February 2010 and RDC's closure in 2014 (and excluding Debtor's salary), Debtor received $369,850.74 from RDC while Plaintiff received $86,028.97, a difference of $283,821.77.[6] In his post-trial proposed findings of fact and conclusions of law, Plaintiff adjusted the amount Debtor allegedly received in this time frame down to $352,850.74. [ECF No. 81 at ¶ 55.] Debtor also established at trial that Plaintiff received an additional check for $12,500.00 that is not reflected on Carter's summary. Using these adjusted figures, Debtor received $352,850.74 from RDC and Plaintiff received $98,528.97, a difference of $254,321.77.

Debtor contests Plaintiff's view of the facts. Debtor does not disagree that, consistent with Carter's review, RDC records (including checks and tax returns) reflect that he, personally, received more funds

4. This tally includes $7,000.00 that RDC sent to the Internal Revenue Service on Debtor's behalf before Plaintiff rejoined RDC.

5. Carter also created, and Plaintiff introduced, an exhibit depicting her analysis of improper credit card usage by Debtor and his wife. [ECF No. 57–27.] The Complaint, however, does not demand relief from Debtor in connection with the use of the credit card.

[ECF No. 1.] Plaintiff's three proofs of claim also do not reference these allegedly inappropriate personal expenses that Debtor charged to RDC.

6. This amount includes the $50,000.00 Pearl obtained from RDC on April 22, 2010, discussed in connection with Count 1 above.

from RDC than Plaintiff, personally, did. In turn, Plaintiff admits that, on at least a few occasions, when Debtor made a withdrawal or took a distribution from RDC, he caused a similar distribution to be made to Plaintiff. Where the parties disagree is on the import of payments RDC made to DDI.

The parties stipulated that DDI, "a corporation owned by [Plaintiff], actually provided goods and services to RDC during the period of 2010 through 2014. [DDI] charged 6% of the gross revenues of RDC as its fee for the services provided." [ECF No. 65 ¶ 69.] As noted above, no written contract memorializes the terms of this relationship. Neither party established the date on which the agreement commenced in 2010 or the date on which it ended in 2014, nor did either calculate six percent of RDC's gross sales in that specific time frame. But the parties did stipulate to the amounts RDC reported as gross income on its tax returns from 2010 through 2014, which permits a calculation of six percent of RDC's gross income in those years:

| Year | RDC Gross Sales | 6% of RDC Gross Sales |
|---|---|---|
| 2010 | $347,353.00 | $20,841.18 |
| 2011 | 698,116.00 | 41,886.96 |
| 2012 | 618,691.00 | 37,121.46 |
| 2013 | 680,764.00 | 40,845.84 |
| 2014 | 517,794.00 | 31,067.64 |
| Total: | $2,862,718.00 | $171,763.08 |

Debtor introduced proof that, from 2010 through 2014, RDC paid DDI $355,678.04.[7] Thus, between 2010 and 2014, and notwithstanding the absence of a written contract, RDC paid DDI far more than the total of six percent of RDC's gross sales, and the amount paid to DDI was comparable to the $352,850.74 that Debtor received in that time frame. In addition, many checks to DDI have similar or identical dates as checks to Debtor.

Debtor testified that he attempted to equalize payments made to him and payments made to Plaintiff by paying compensation to Plaintiff through DDI. Debtor stated that he "always" told Pamela Gross that distributions made to him and to Plaintiff had to be equal, and that he also understood that Plaintiff did not want to receive checks directly from RDC written through its payroll account. Debtor also testified that he relied on Gross, his "accountant," to help him with RDC's finances while he focused on running RDC's clinic. However, Debtor's admitted and evident memory issues and his changing positions on why a disparity existed between the parties' distributions raise significant questions about his testimony.[8]

Debtor also introduced testimony from Pamela Gross about distributions made by RDC. Through her company, Gross pro-

---

7. Defendant introduced a copy of RDC's "Transactions by Account" Quickbooks information for transactions with DDI. [ECF No. 58–4.] While the document reflects payments totaling $355,678.04 from RDC to DDI, it also reflects $25,000.00 in loans from DDI to RDC and a returned check for $28,614.84. The net amount DDI received from 2010 to 2014 was $302,063.20, and this total includes almost $8,000.00 that RDC paid DDI for specific supplies.

8. At an unknown point, but prior to end of 2014, Debtor contracted a serious illness. The medication Debtor takes for that illness has affected his memory. His memory problems existed as of his Rule 2004 exam in June 2016 and his deposition in May 2017, and were evident at trial.

vided bookkeeping and tax preparation services for RDC for a period of time ending in 2014.[9] Gross explained that she spoke regularly with both Plaintiff and DDI professionals, and that she sometimes joined the telephone calls involving Plaintiff and Debtor and often others at DDI. She testified that Will Sullivan, an in-house accountant for DDI, instructed her not to have Plaintiff's draws or distributions paid through RDC payroll, as it apparently created a problem with Plaintiff's "Social Security." She also testified that she did not have a clear understanding of how draws for Debtor and Plaintiff would be taken, but "if [Debtor] said 'I would take a check for $10,000.00,' [Plaintiff] would be on the phone and it would be checks to both." Moreover, she stated that RDC regularly wrote checks to Plaintiff and DDI that were "outside" of DDI's six percent fee. She explained that, even though she was not on every call that Debtor and Plaintiff had with each other, she "knew" that whenever Debtor cut himself a check he had spoken with Plaintiff, and that if there was an instruction to her to prepare a check for Debtor, there also would be a check written for Debtor to sign "for" Plaintiff.

## JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding and venue is proper. 28 U.S.C. §§ 1334(b), 1409. Plaintiff's non-dischargeability claims are core proceedings. 28 U.S.C. § 157(b)(2)(I). At the pretrial conference, the parties confirmed their consent to the Court's entry of final orders on these claims.

## DISCUSSION

### I. Claims Under § 523(a) Follow a Two–Step Framework.

Section 523(a) of the Bankruptcy Code contains several categories of non-dischargeable debt. To succeed on a claim made under a subsection of § 523(a), a plaintiff must prove by a preponderance of the evidence each requisite element to support the determination that a specific debt is non-dischargeable under those subsections. *Merritt v. Layne (In re Layne)*, 517 B.R. 778, 781 (Bankr. E.D. Ky. 2014). "Exceptions to discharge are narrowly construed in the debtor's favor." *HIJ Indus. v. Roy (In re Roy)*, 565 B.R. 820, 830 (Bankr. E.D. Ky. 2017) (citing *In re Zwosta*, 395 B.R. 378, 382–83 (6th Cir. BAP 2008)).

The first step in any analysis under § 523(a), however, is not whether a debt is non-dischargeable, it is whether a debt even exists—a "threshold condition" to whether § 523(a) applies. *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). "A 'debt' is defined in the Code as 'liability on a claim,' a 'claim' is defined in turn as a 'right to payment,' and a 'right to payment,' we have said, 'is nothing more nor less than an enforceable obligation.'" *Id.* (citations omitted). Whether a valid claim exists must be determined in accordance with state law *before* a bankruptcy court decides whether,

9. Gross and Debtor executed an engagement letter between RDC and her company on January 11, 2013, but she provided services to RDC before this time. Under the engagement letter, RDC was to pay a minimum of $2,915.00 per month for services including monthly bookkeeping, monthly "CFO" services, preparation of corporate and personal tax returns, and payroll services. Prior to January 2013, Gross's entity had charged RDC $12,000.00 to $13,000.00 per year for its services. Gross explained that the new contractual arrangement resulted from the fact that Debtor, owing to his illness, became unable to handle certain job duties that he previously had performed.

under federal law, the debt is non-dischargeable:

> At the outset, we distinguish between the standard of proof that a creditor must satisfy in order to establish a valid claim against a bankrupt estate and the standard that a creditor who has established a valid claim must still satisfy in order to avoid dischargeability. The validity of a creditor's claim is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code.

*Grogan v. Garner*, 498 U.S. 279, 283–84, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citations omitted); *see also Walker v. Vanwinkle (In re Vanwinkle)*, 562 B.R. 671, 677 (Bankr. E.D. Ky. 2016) ("The § 523(a)(2)(A) analysis is a two-step process: (1) determine the validity of the debt; and (2) determine whether the debt is non-dischargeable under the statute." (citing *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 & n.39 (10th Cir. BAP 2016))).

The analyses needed to decide Plaintiff's claims are not straightforward. In part, this is because of the varying capacities under which Plaintiff pursues the claims. Plaintiff also created confusion by not following the aforementioned two-step process. Further, complications arise because Plaintiff ignores the distinction between himself and the corporate entities involved.

The combined effect of these issues requires the Court to add precision to Plaintiff's claims that otherwise is lacking.

## II. Plaintiff is not Entitled to Relief Under Count 1 Regarding the $50,000.00 Loan.

The repaid $50,000.00 loan serves as the basis for Count I. Plaintiff asserts that Debtor committed common law fraud in connection therewith. Plaintiff claims generally that Debtor took funds from RDC and loaned those funds to Plaintiff and, had Plaintiff known this, he would not have sent $50,000.00 to Debtor in July 2012. When Debtor filed his bankruptcy petition, Debtor and Plaintiff were litigating Plaintiff's fraud claim against Debtor pertaining to this loan in Tennessee state court.

■ To adjudicate Count 1, it is imperative that the capacity in which Plaintiff claims a right to relief on this cause of action and the basis for the alleged debt is clear. Specifically, in Count 1, Plaintiff *does not* assert liability against Debtor *on RDC's behalf* for a purported improper withdrawal of $50,000.00 from RDC in April 2010. Rather, Plaintiff asserts that Debtor owes Plaintiff, *in his personal capacity*, a $50,000.00 debt because Plaintiff repaid $50,000.00 to Debtor in 2012 when, instead, Plaintiff should have repaid that money (if at all) to RDC.[10]

---

10. The Complaint alleges: "[Plaintiff] was damaged by the fraudulent acts of [Debtor]; but for the fraud, [Plaintiff] would have repaid the $50,000.00 to [RDC], a corporation in which he owned two-thirds (⅔) of the stock, *or he would have offset the balance against the unauthorized distributions made to [Debtor]*." [ECF No. 1 ¶ 23 (emphasis added).] In other words, Plaintiff alleges that *he may not have paid any funds to RDC at all* even if, as he alleges, the funds loaned to him were RDC's funds. In this way, Plaintiff conflates what is RDC's money with his personal interest in RDC. Plaintiff may not borrow, take, or withhold RDC's money, or otherwise deal with it as if it is his own, just because he owns RDC stock. *See, e.g., Ferrara v. Oakfield Leasing, Inc.*, 904 F.Supp.2d 249, 268 (E.D.N.Y. 2012) (stating that a shareholder improperly used a corporation "as his 'personal piggy bank', in that he used corporate funds for personal rather than corporate purposes" and thereby exhibited a "lack of respect for the corporate form")).

**A. The Complaint asks the Court to determine that a debt exists based on fraud, but it does not plead a clear state law cause of action for fraud upon which the Court should find that a debt exists.**

The Tennessee state court did not decide Plaintiff's fraud claim against Debtor before Debtor filed his bankruptcy petition. Hence, Plaintiff had not reduced his claim to a judgment in that case—and did not establish a debt exists—before Plaintiff started this action.

The Complaint appears to acknowledge the principle that, to succeed on a nondischargeability claim under § 523(a), Plaintiff first must establish the existence of a debt. Count 1 of the Complaint seeks "a judgment on [a] fraud claim" and "$50,000.00, plus prejudgment interest, for the fraud perpetrated upon Feldman concerning the requested loan." [ECF No. 1 p.4 ¶ 25, p.5 ¶ 1.] The Complaint also seeks an Order "excepting the aforementioned debt[ ] from discharge." [*Id.*, p.5 ¶ 3.]

The Complaint, however, does not clearly allege a common law fraud claim against Debtor for $50,000.00 under state law. Instead, in Count 1 the Complaint tracks the elements that must be proven for a debt to be deemed non-dischargeable under § 523(a)(2)(A). Because this issue was not raised on a motion to dismiss and the parties participated in a trial, and reading the Complaint charitably in Plaintiff's favor, the Court will construe Count 1 to assert a claim for $50,000.00 arising from common law fraud under state law.

**B. Kentucky substantive law applies.**

 The next question is which state's substantive law should be applied for purposes of establishing the validity of the alleged debt. Bankruptcy courts are federal courts, and federal courts apply state law to substantive state law ques-

tions. *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203, 205 (4th Cir. 1988). To determine which state's law applies, federal courts in Kentucky use Kentucky choice of law rules. *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017) ("As a federal court exercising diversity jurisdiction, the choice-of-law rules of the forum state, Kentucky, determine what substantive law to apply."); *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) ("A federal court exercising supplemental jurisdiction is bound to apply the law of the forum state, including its choice of law rules.").

 Common law fraud is a tort claim. *Imaging Fin. Servs., Inc. v. Lettergraphics/Detroit, Inc.*, No. 97-1930, 1999 WL 115473, at *2-3, 1999 U.S. App. LEXIS 2405, at *8 (6th Cir. Feb. 9, 1999) (table decision). Kentucky choice of law rules provide that Kentucky law will apply to tort claims so long as there are "significant contacts" with Kentucky. *Aces High Coal Sales, Inc. v. Cmty. Trust & Bank*, Civil Action No. 15-161-DLB-HAI, 2017 WL 3122661, at *12, 2017 U.S. Dist. LEXIS 113639, at *39 (E.D. Ky. July 21, 2017) (citing *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)). Debtor is a Kentucky citizen. He made purported misrepresentations and engaged in questioned financial transactions in Kentucky. His alleged wrongful conduct concerns the operations of and funds belonging to a Kentucky corporation, RDC. Thus, the Court will apply Kentucky law to Plaintiff's state law tort claim owing to these significant contacts with Kentucky.

 Under Kentucky law, a claimant must establish six elements to prove a common law fraud claim: "(a) a material misrepresentation, (b) which is false, (c) known to be false or made recklessly, (d)

made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citation omitted).[11] "A material misrepresentation is defined as 'substantial inaccuracies of the type which would generally affect a [creditor's] decision.' " *Central Bank & Trust Co. v. Mustafa (In re Mustafa)*, 557 B.R. 533, 539 (Bankr. E.D. Ky. 2016) (citations omitted). "A plaintiff is required to prove fraud by clear and convincing evidence, a heightened standard of proof." *Norwich v. Norwich*, 459 S.W.3d 889, 899 (Ky. 2015) (citation omitted). "Where the proven facts or circumstances merely show inferences, conjecture, or suspicion, or such as to leave reasonably prudent minds in doubt, it must be regarded as a failure of proof to establish fraud." *Bates v. Alliance Banking Co.*, No. 2016–CA–000410–MR, 2017 WL 3328116, at *5, 2017 Ky. App. Unpub. LEXIS 572, at *15 (Ky. Ct. App. Aug. 4, 2017) (citing *Goerter v. Shapiro*, 254 Ky. 701, 72 S.W.2d 444, 445–46 (1934)).

### C. Plaintiff did not carry his burden to prove that Debtor committed common law fraud to establish the existence of a debt.

■ Plaintiff did not establish by clear and convincing evidence the existence of a $50,000.00 debt owed by Debtor to Plaintiff arising from common law fraud under Kentucky law. In fact, Plaintiff lacked a cogent and viable legal theory with respect to this claim. Primarily, Plaintiff did not

prove that he suffered an injury, a glaring problem with Plaintiff's position.

■ Under Kentucky law, a fraud victim is entitled to compensation for injuries that are the natural and proximate result of the fraud. *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 56 F.3d 726, 735 (6th Cir. 1995). Long ago, Kentucky's highest court adopted the Restatement's view with respect to the measure of damages available to a fraud victim:

> In Restatement of the Law of Torts, Volume 3, Section 549, page 108, the rule is stated as follows:
>
> "The measure of damages which the recipient of a fraudulent misrepresentation is entitled to recover from its maker as damages * * * is the pecuniary loss which results from the falsity of the matter misrepresented, including
>
> "(a) the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it, and
>
> "(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the truth of the representation."

*Sanders, Inc. v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957) (emphasis added).

The evidence presented at trial established that Plaintiff accepted a $50,000.00 loan from Debtor, and then he and DDI repaid Debtor that $50,000.00.[12] Plaintiff

---

11. Kentucky has a five-year statute of limitations for fraud after the cause of action accrued, which begins to run when the plaintiff discovers fraud. KY. REV. STAT. § 413.120(3), (11); *Gresh v. Waste Services of America, Inc.*, 311 Fed.Appx. 766, 774–75 (6th Cir. 2009). Defendant asserted that, under Tennessee law, the statute of limitations bars this claim. Based on the facts presented at trial and

Kentucky law, the Court finds that the statute of limitations does not bar Count 1.

12. The Court largely accepts Plaintiff's testimony and Sirgo's testimony with regard to the facts underlying how the loan came to pass. Debtor's testimony on the subject was unreliable. Debtor posited in the Tennessee case that he did not recall the transaction, but

argues that, had he known Debtor had obtained $50,000.00 from RDC and then loaned those funds to Plaintiff (which he also did not prove, as noted below), Plaintiff would not have repaid Debtor the $50,000.00. But repaying a debt actually incurred does not create an injury. If Debtor wrongfully took $50,000.00 from RDC and loaned those funds to Plaintiff, *then RDC suffered the injury when Debtor took its funds.*[13] The fact that Plaintiff owns an interest in RDC, or claims a right to offset based on Debtor's allegedly wrongful distributions from RDC, does not mean that Plaintiff suffered an actual pecuniary loss when he repaid a debt. Repaying Debtor the exact sum Plaintiff borrowed for over two years, interest free, simply did not cause Plaintiff any cognizable injury.

The Court also finds that the evidence presented did not show by clear and convincing evidence that Debtor made an intentional material misrepresentation to Plaintiff. First, Plaintiff did not prove that the "source" of the funds Debtor loaned to Plaintiff was material. Plaintiff wanted a $50,000.00 interest-free loan and Debtor gave him one. Debtor sent Sirgo more than sufficient funds to cover this loan even if Debtor had not withdrawn $50,000.00 from RDC in April 2010. Next, because Plaintiff did not establish the date on which he requested the loan, he also did not prove that RDC even had $50,000.00 to loan to him when he asked Debtor to cause RDC to make a loan. Further, Plaintiff did not prove that RDC, even if it had more than $50,000.00 in its account when Plaintiff asked for a loan, was in any position to lend an interest-free $50,000.00 to Plaintiff without a business purpose shortly after RDC had, by all accounts, been in severe financial jeopardy.

For all of these reasons, Plaintiff failed to prove an enforceable $50,000.00 fraud claim against Debtor by clear and convincing evidence.[14]

**D. Even if Plaintiff had proven the existence of a $50,000.00 debt, Plaintiff failed to carry his burden to demonstrate an entitlement to relief based on actual fraud under § 523(a)(2).**

Even if Plaintiff had established an enforceable common law fraud claim, he is not entitled to relief under § 523(a)(2)(A) which excepts a claim "obtained by . . . false pretenses, a false representation, or actual fraud" from a debtor's discharge. A claimant seeking relief under § 523(a)(2)(A) carries the burden to prove by a preponderance of the evidence

> that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth.

---

did remember demanding that Plaintiff repay him. At his Rule 2004 exam (the transcript of which was admitted as evidence at trial), Debtor did not recall the circumstances of the $50,000.00 transfer to Plaintiff or its repayment in 2012. At trial, Plaintiff exhibited confusion and a lack of recollection about the circumstances surrounding the loan, including that he did not recall authorizing Sirgo to send funds to Plaintiff.

**13.** As stated above, Plaintiff, the assignee of all of RDC's claims against Debtor, did not assert and pursue a claim for relief in this case based on the theory that Debtor wrongfully took $50,000.00 from RDC on April 22, 2010.

**14.** At the close of Plaintiff's proof, Debtor moved for judgment as a matter of law on Count 1 with respect to the $50,000.00 loan as Plaintiff had not established that he, personally, had incurred any damages. Debtor argued that RDC, and not Plaintiff, would have suffered any injury related to Debtor's conduct at issue in Count 1. The Court took that motion under submission and now agrees with Debtor for the reasons outlined herein.

The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir. 1996) (quoting *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir. 1993)). The evidence does not support that Plaintiff established a right to relief under this standard because, for the reasons stated above, Plaintiff did not suffer any direct loss or injury when he and DDI repaid the $50,000.00 that he alone borrowed for two years with no interest, nor did Plaintiff establish that Debtor intended to deceive him when Debtor made the loan.

### III. Count 2—Plaintiff Failed to Carry his Burden to Demonstrate an Entitlement to Relief under § 523(a)(2), (4) or (6) for Unauthorized Withdrawals from RDC.

Plaintiff bases his claim in Count 2 upon the premise that the Court should compare only the checks from RDC specifically written to Plaintiff with the amounts Debtor received from RDC. Plaintiff claims that the amount of disproportionate draws Debtor took should be deemed non-dischargeable. As with Count 1, to succeed under Count 2, Plaintiff first must establish that Debtor owes a debt. Plaintiff did not prove that any such debt exists.

#### A. Plaintiff did not prove that Debtor owes a debt based on common law fraud in connection with the alleged disparity in distributions that can be deemed non-dischargeable based on § 523(a)(2)(A).

 In Count 2, the Complaint states that Plaintiff seeks relief under § 523(a)(2)(A) based on fraud that Debtor allegedly committed against RDC or against Plaintiff in connection with "unauthorized withdrawals [which] totaled approximately $283,821.77." [ECF No. 1 ¶¶ 30, 33, 34.] The Complaint avers that Plaintiff, "individually or as assignee of RFC, is entitled to an Order of the Court excepting these withdrawals from discharge." [*Id.* ¶ 34.] As with Count 1, Count 2 does not plead a claim for relief under state or other non-bankruptcy law to establish the existence of a debt related to the unauthorized withdrawals.

Setting this pleading deficiency aside, the Court finds that Plaintiff failed to prove a fraud claim against Debtor at trial under Kentucky law on behalf of himself or RDC related to unauthorized withdrawals. While Plaintiff introduced evidence about the payments made to or on behalf of Debtor, and compared the sum of those payments with the total of payments made to Plaintiff, personally, Plaintiff made no effort to prove at trial how such alleged disparity constituted fraud on either Plaintiff or RDC. Indeed, Plaintiff's post-trial proposed findings of fact and conclusions of law do not even attempt to explain how Plaintiff committed common law fraud with respect to the disparity of withdrawals. Any claim under § 523(a)(2)(A) fails.

#### B. Plaintiff did not establish that Debtor owes a debt based on conversion in connection with the alleged disparity in distributions, and thus may not pursue a nondischargeability claim via Count 2 under § 523(a)(4).

 Plaintiff also seeks relief under § 523(a)(4) in Count 2. A debt is nondischargeable under § 523(a)(4) if it is incurred by (a) fraud or defalcation while acting in a fiduciary capacity, (b) larceny, or (c) embezzlement. Resolving two preliminary matters will clarify the inquiry with respect to Count 2.

■ First, and just as with Count 1, to adjudicate Count 2, it is vital that the capacity in which Plaintiff claims a right to relief on this cause of action and the basis for the alleged debt is clear. Specifically, in Count 2, Plaintiff *does not* assert liability against Debtor *on his own behalf* owing to Debtor's allegedly unbalanced distribution of RDC's funds in violation of the parties' oral agreement. Rather, in Count 2, Plaintiff asserts that Debtor owes Plaintiff, *as the assignee of RDC's claims against Debtor*, a $283,821.77 debt because Debtor allegedly distributed that much more to himself from RDC than to Plaintiff.[15]

Second, although the Complaint references Debtor's "fiduciary duties," the Complaint does not use the word larceny. More importantly, neither the evidence nor Plaintiff's post-trial proposed findings of fact and conclusions of law provide either evidentiary or legal support for the proposition that Plaintiff committed either fraud or defalcation while acting in a fiduciary capacity, or larceny, with respect to the allegedly disparate distributions. Therefore, the Court considers only whether Plaintiff established that Debtor committed embezzlement.

### 1. Plaintiff failed to prove the existence of a debt subject to Section 523(a)(4).

■ A claim under § 523(a)(4) has the same fundamental prerequisite as a claim under § 523(a)(2)(A): the existence of a debt. "Whether a plaintiff has standing to object to the dischargeability of a debt is, of course, based on whether that party <u>has</u> a debt to object to. In bankruptcy, whether there is a debt is a question of state law." *Allen v. Scott (In re Scott)*, 481 B.R. 119, 138 (Bankr. N.D. Ala. 2012) (emphasis in original).

■ Similar to Count 1, Count 2 of the Complaint conflates the two-step process required to address a § 523(a) claim. Plaintiff failed to plead any cause of action under state (or other non-bankruptcy) law pursuant to which Plaintiff asserts a debt exists that would be non-dischargeable as embezzlement under § 523(a)(4). Kentucky does not recognize a civil cause of action for embezzlement. Based on the Complaint's allegations about unauthorized withdrawals, its use of the term embezzlement, and the proof Plaintiff offered at trial, the closest civil analogue for purposes of finding a claim creating a debt under Kentucky law is the tort of conversion. *Fontaine v. P & J Resources, Inc. (In re P & J Resources Inc.)*, 475 B.R. 838, 862 (Bankr. E.D. Ky. 2012) ("Conversion is a tort involving the 'wrongful exercise of dominion and control over property of another.'" (quoting *State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. App. 1990))); *see also Panther*

---

15. The Complaint alleges: "In the alternative, Feldman, in his own right as owner of two-thirds (⅔) of the stock of RFC, is entitled to a judgment against Pearl for two-thirds (⅔) of the amount of improper withdrawals." [ECF No. 1 ¶ 28.] Thus, Plaintiff's asserted standing under Count 2 is not on the basis of harm he allegedly incurred *personally*, but rather harm he suffered *derivatively* based on his interest in RDC. As this Court stated when dismissing Debtor's counterclaims, "'[c]orporate assets are the property of the corporation, not the shareholders'" and "'if corporate assets are misappropriated ... it is an injury to the corporation, not a shareholder.'" *Feldman v. Pearl (In re Pearl), supra*, 2017 WL 932951, at *8, 2017 Bankr. LEXIS 616, at *22 (citing *Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015)). This comports with the absence in Plaintiff's findings of fact and conclusions of law of any argument that Debtor personally owes Plaintiff a debt in connection with embezzlement from RDC that should be deemed non-dischargeable. [ECF No. 81 at pp. 37–38.]

*Petro., LLC v. Couch (In re Couch),* 544 B.R. 867, 875 (Bankr. E.D. Ky. 2016) ("The Plaintiffs sought damages for breach of fiduciary duty and conversion in the state court, which are counts often associated with a § 523(a)(4) action."), *aff'd,* No. 16-8009, 2017 WL 444644, 2017 Bankr. LEX-IS 301 (6th Cir. BAP Feb. 2, 2017). Plaintiff's findings of fact and conclusions of law reference the unauthorized withdrawals as "conversion."

■ To prove a conversion claim, a plaintiff must show:

(1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Madison Capital Co., LLC v. S & S Salvage, LLC,* 765 F.Supp.2d 923, 931–32 (W.D. Ky. 2011) (citing *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon,* 157 S.W.3d 626, 632 n.12 (Ky. 2005)). "Conversion has also been defined in more succinct terms as 'the deceitful, intentional appropriation of the money without the right or without belief of right[.]' " *Fontaine,* 475 B.R. at 863 (citations omitted). In his proposed findings of fact and conclusions of law, Plaintiff argues that a case from the Bankruptcy Court in the Western District of Kentucky, *Fed. Ins. Co. v. Woods (In re Woods),* 558 B.R. 164 (Bankr. W.D. Ky. 2016), "presented a similar case as this one." [ECF No. 81 at 27.] In *Woods,* the debtor admitted to having committed criminal acts of embezzlement. Debtor in this case, however, has neither admitted criminal embezzlement nor been charged with or convicted of any such offense.

■ The Court finds that Plaintiff did not establish by a preponderance of the evidence that Debtor deceitfully and intentionally appropriated money from RDC without any right to do so, or without a belief that he had a right to do so, based on the disparity between the parties' respective personal distributions from RDC. The Court further finds that payments made to DDI must be taken into account when evaluating whether Debtor committed conversion.

While the parties stipulated that it was agreed that DDI would receive six percent of RDC's gross sales, it is significant to the Court that this arrangement was not memorialized in a written contract. According to Leatherwood, DDI had written contracts with respect to the other clinics with which DDI had relationships—the vast majority of which Plaintiff did not own. This evidenced that DDI and Plaintiff intentionally chose to create a different relationship with RDC—an entity owned in part by Debtor, Plaintiff's cousin and childhood best friend—than with the other clinics.

As noted earlier, although Debtor's admitted memory issues and changing positions raised questions about his testimony regarding the alleged discrepancy, Gross largely corroborated it. The Court found Gross' testimony to be credible and vastly more believable the Plaintiff's testimony on the import of payments made to DDI. Debtor and Gross testified at length about their multiple telephone calls with Plaintiff in which RDC's finances and payments by

RDC would be discussed; while Plaintiff acknowledged having calls with Debtor, he unconvincingly downplayed their significance and content. Debtor and Gross also credibly explained why DDI received far more than six percent of RDC's gross revenue in the relevant time frame: Plaintiff wanted to receive funds from RDC this way, rather than as direct payments to him.

While the Court did not find Plaintiff to be credible on this issue, the Court still was strongly influenced by Plaintiff's testimony and conduct in reaching a conclusion on his conversion claim. Plaintiff convinced the Court that he does not respect the fundamental distinction between a corporate entity and its owners. Plaintiff, for no justifiable business reason, wanted a corporation operating a struggling diet clinic to loan him $50,000.00, without interest, so that he could pay personal obligations. Plaintiff testified that DDI's money was "his money" and its loans to RDC were "his loans." When Plaintiff repaid Debtor for the $50,000.00 loan, he took $10,000.00 from DDI to do so—and Plaintiff failed to prove that he and DDI actually treated this $10,000.00 payment as a loan. This evidence strongly suggests that the parties understood that RDC's payments to DDI actually were payments to Plaintiff.

In fact, the evidence at trial confirmed that neither Plaintiff nor Debtor observed corporate formalities with respect to RDC. This fact further convinces the Court that Debtor and Plaintiff would view payments to DDI as payments to its owner, and further undermines the credibility of Plaintiff's position with regard to the import of distributions to DDI.

For these reasons, the Court finds that Debtor's view of the facts presented—that payments to both Plaintiff and DDI must be taken into account when considering Plaintiff's conversion claim—to be more believable than Plaintiff's version. Plaintiff did not establish any deceitful or intentionally wrongful conduct by Debtor, and therefore Plaintiff did not prove by a preponderance of the evidence that Debtor owes a debt to RDC based on conversion.

**2. Even if Plaintiff had established a debt, he did not establish that RDC is entitled to relief under § 523(a)(4).**

 For the reasons stated above, the Court finds that Plaintiff did not prove that Debtor owes a $283,821.77 debt to Plaintiff as the assignee of RDC's conversion claim against Debtor. Even if the Court had reached the opposite conclusion, however, the Court would not find that Plaintiff is entitled to relief under § 523(a)(4), and thereby hold that the debt is non-dischargeable as a result of embezzlement. The Sixth Circuit has explained:

> Federal law defines "embezzlement" under section 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir. 1996) (citations and internal quotation marks omitted). "To succeed on a theory of embezzlement, the Plaintiff must prove that '(a) the Debtor appropriated funds for his own benefit, and (b) he did so with fraudulent intent or deceit. Both the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence.'" *Cardwell v. Hester (In re Hester)*, 559 B.R. 472, 477–478 (Bankr. W.D. Ky. 2016) (quoting *In re James*, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984)).

Although Plaintiff presented much testimony regarding deficiencies in Debtor's record-keeping, there was no proof, circumstantial or otherwise, of fraudulent intent or deceit. Weighing the evidence presented, for the reasons stated above with respect to Plaintiff's failure to prove his conversion claim, the Court finds that Plaintiff did not establish that Debtor appropriated RDC funds for his own benefit with fraudulent intent or deceit so as to constitute embezzlement, resulting in non-dischargeable debt under § 523(a)(4).

**C. Plaintiff did not establish that Debtor owes a debt to RDC resulting from a willful and malicious injury, and thus may not pursue a non-dischargeability claim via Count 2 under § 523(a)(6).**

 Finally, § 523(a)(6) excepts from discharge "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To succeed on this claim, Plaintiff had the burden to prove by a preponderance of the evidence that Debtor engaged in willful and malicious conduct that resulted in an injury to RDC or its property. As the Bankruptcy Appellate Panel for the Sixth Circuit stated:

> To except a debt from discharge under § 523(a)(6), the alleged injury must be both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). For a debt to be held willful and malicious as contemplated by § 523(a)(6), the act at issue must be done with the actual intent to cause injury. *Id.* at 464. The requisite intent is present when the debtor " 'desires to cause [the] consequences of his act, or ... believes that the consequences are substantially certain to result from it.' " *Id.* (citation omitted). Section 523(a)(6) requires a debtor to commit an act akin

to an intentional, rather than negligent or reckless tort. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). An act is "malicious" if it is undertaken "in conscious disregard of one" duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). "Malicious" acts do "not require ill-will or specific intent to do harm." *Id.* The party seeking to deny debtor a discharge bears the burden of proving both requirements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

*In re Phillips*, 434 B.R. 475, 483 (6th Cir. BAP 2010).

 As a result, to succeed under § 523(a)(6), Plaintiff had to show that Debtor "actually intended the injury caused, not merely intended the act that caused the injury." *Bush v. Roberts (In re Roberts)*, 452 B.R. 597, 603 (Bankr. W.D. Ky. 2011). A willful and malicious injury has not been committed unless the "actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it." *Markowitz*, 190 F.3d at 464. "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. at 64, 118 S.Ct. 974.

 The Court concludes that Plaintiff did not adduce evidence of an intentional and malicious injury that caused any debt owed by Debtor to RDC. To be sure, Plaintiff put forward proof that Debtor obtained a different amount of funds from RDC than Plaintiff did after Plaintiff returned to RDC, but Plaintiff did not prove that this created a debt owed to RDC. Further, even assuming that a debt did exist in RDC's favor against Debtor owing to disparate distributions, the fact that a

disparity exists, without more, is insufficient to except a debt from discharge under § 523(a)(6). The evidence presented at trial did not establish that Debtor's uneven disbursements to himself on the one hand, and to DDI and Plaintiff on the other, was done with an actual intent to cause an injury to RDC or to its property.

## CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. In reaching the conclusions found herein, the Court has considered all of the parties' stipulations, evidence, exhibits, and arguments of counsel, regardless of whether or not they are referred to specifically in this Memorandum Opinion.

A Judgment in Debtor's favor dismissing Plaintiff's claims with prejudice shall be entered. As the prevailing party, the Court finds that Debtor is entitled to recover his costs of suit from Plaintiff, which Debtor demanded in his Answer. Debtor may submit a bill of costs. FED. R. BANKR. P. 7054(b)(1).